UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
JULIE STRAEHLE,

              Plaintiff,

     -against-

INA LIFE INSURANCE COMPANY OF NEW
YORK, n/k/a CIGNA LIFE INSURANCE
COMPANY OF NEW YORK,

              Defendant.

--------------------------------------------------------------x

**MEMORANDUM AND
ORDER**
Case No. CV-01-7180(FB)(RML)

*Appearances:*
*For the Plaintiff:*
SOLOMON M. LOWENBRAUN, Esq.
425 Northern Boulevard
Great Neck, NY 11021

*For the Defendant:*
KEVIN J. BRENNAN, Esq.
55 John Street
New York, NY 10038

**BLOCK, District Judge:**

        Plaintiff Julie Straehle ("Straehle") filed suit pursuant to § 1132(a)(1)(B) of the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*,

alleging that defendant CIGNA Life Insurance Company ("CIGNA") wrongfully denied

her claim for long-term disability benefits. For the reasons set forth below, the Court

disagrees and grants judgment for defendant.

        The long-term disability policy (the "Policy") issued by CIGNA to Straehle's

employer, NEC America ("NEC"), provides that CIGNA "will begin paying monthly

benefits . . . when it receives due proof that (1) the employee became Disabled while insured for this Long Term Disability Insurance." A.R. 17.[1] Under the Policy, "[a]n Employee will be considered Disabled "if because of Injury or Sickness . . . [s]he is unable to perform all the material duties of h[er] regular occupation; and after Monthly Benefits have been payable for 24 months, [s]he is unable to perform all the material duties of any occupation for which [s]he is or may reasonably become qualified based on h[er] education, training or experience." A.R. 7. The policy defines "Injury" as "an accidental bodily injury"; "Sickness" is defined as "a physical or mental illness." A.R. 5.[2] An "Employee" who is eligible for benefits under the Policy is defined as "a full-time Employee of the Employer." A.R. 5. CIGNA's long-term benefits application asks claimants to describe both "what prevents you from performing YOUR occupation," and "what prevents you from engaging in ANY gainful employment." A.R. 149.

CIGNA reviews applications for disability benefits according to a two-step process. At the initial level, a CIGNA case manager collects information and medical evidence from the claimant, and renders a determination regarding the claimant's eligibility for benefits based upon a review of all the evidence in the claimant's file.[3] A

_____

[1]References to "A.R. ___" are to the administrative record which was previously filed with the Court.

[2]The Policy will not provide benefits due to any disability resulting from a pre-existing condition, defined as "an Injury or Sickness for which the employee, during the 3 months prior to the most recent Effective date of [her] insurance: (1) incurred expenses; (2) received medical treatment; (3) took prescribed drugs or medicines; or (4) consulted a physician." A.R. 19.

[3]In Straehle's case, her file was also reviewed at the initial level by a CIGNA medical consultant, a CIGNA consulting physician, and a second case manager; it is unclear whether CIGNA conducts such reviews as a matter of course in all cases.

claimant whose application is denied may request a review within 60 days by submitting a written request to the claimant's case manager, along with any additional documentation pertinent to her claim. On appeal, the entire file, which may include medical evidence collected after the case manager's denial, is reviewed by a CIGNA appeals claim examiner, after which the examiner renders a decision affirming or reversing the denial.[4]

CIGNA's denial of Straehle's application by her case manager on February 8, 1999, less than a year following the onset of her alleged disability in March 1998, addressed only the issue of whether Straehle was disabled from performing her *own* occupation. Concluding that Straehle was "unable to establish the existence of a disabling condition that prevented [her] from performing the duties of [her] occupation as a Senior Quality Assurance Engineer," A.R. 45, CIGNA's case manager did not address the question of whether – under the policy's definition of disability extending beyond 24 months – she was disabled from *any* occupation.

Instead of appealing pursuant to CIGNA's appeals process, Straehle initiated an action against CIGNA in state court on September 28, 2000, about a year and a half after the case manager's decision. CIGNA removed the action to federal court in October 2001, and on February 2, 2002, the parties entered into a stipulation administratively closing the case until Straehle exhausted her administrative remedies with CIGNA. The CIGNA appeals claim examiner thereafter considered documentation and medical evidence submitted by Straehle, which covered the period from March 1998 through April 2002; on August 13, 2002, the appeals examiner affirmed the case manager's determination that

---

[4]Straehle's file was also reviewed upon appeal by a second CIGNA physician; again, it is not clear whether such a review is customary.

Straehle had not demonstrated her inability to perform her past occupation and, therefore, was not entitled to disability benefits under the Policy. In its letter notifying Straehle of its final determination, CIGNA did not "suggest no one could be disabled without objective medical evidence," but stated that Straehle "is not a reliable source of information about the extent of her injuries or her ability to work," and that the objective medical evidence, which was particularly important under these circumstances, did "not . . . support[] [Straehle's] claim." A.R. 994.

Returned to this Court, both parties moved for summary judgment on the administrative record. Following oral argument on January 13, 2004, the Court denied the motions, finding that there were issues of fact regarding whether Straehle was disabled under the terms of the Policy. A bench trial was thereafter held on December 16 and December 20, 2004, during which the Court heard testimony from Straehle and her current treating physician, Dr. Sheldon Zuckerman; although the Court allowed Straehle to present evidence regarding her eligibility for benefits both prior to and following the initial 24-month period established by the Policy, the Court did not rule on whether it would

consider any of the evidence received at the hearing.[5]

_____

[5]During oral argument on the parties' motions for summary judgment, the following exchange occurred between the Court and counsel for CIGNA:

The Court:  You don't necessarily need a vocational expert but you still have to show me something about what she's capable of doing or not capable of doing based upon her experience and training, et cetera, out in the general population.  I think there are issues of fact that would best be explored at a hearing, factual hearing, in respect to both prongs of the disability definition.  (1) Whether she is unable to perform or was unable to perform all of the material duties of her regula[r] occupation. . . . Second, you may well be successful about the long-term prospects.  How old is the woman, 48?

Mr. Lowenbraun:  She's 47, 48 years old.

The Court:  She's got another 18 years or 17 years to go.  But you have to march an additional mile or so to get me to agree with you because I need to know something about what else is out there in the population that she might be able to do; okay?  So I can't be more helpful to you than that.  Summary judgment is denied in both respects and you'll just get this case trial ready . . . Are you finished with discovery?

Mr. Brennan:  Yes, although there's two things I would just like to bring up.  One is if there's new evidence, for example, your Honor mentioned vocational evidence, I think it raises exhaustion issues.

The Court:  What's the exhaustion issue[]?

Mr. Brennan:  That the plan administrator, in this instance the insurance company, should pass on –

The Court:  I'm not going to hold for you on that.  I mean, it's a de novo matter.  I am going to give him some flexibility.

Tr. of Jan. 13, 2004, at 22-24.

In its trial memorandum, CIGNA renewed its argument that in denying Straehle's application, it had considered only the question of whether Straehle was entitled to the first 24 months of disability benefits under the policy by reason of her inability to perform her own occupation.  CIGNA argued that even if the Court were to find that Straehle had proven her entitlement to these benefits, it should remand to CIGNA for initial consideration of any benefits due after the first 24 months, which

Because CIGNA determined that Straehle was capable of performing her past occupation, it did not address the more restrictive standard governing entitlement to benefits beyond 24 months by reason of an inability to perform *any* occupation; consequently, the latter issue is not ripe for review and the Court addresses only Straehle's eligibility for disability benefits for the first 24 months following the onset of her alleged disability. *See Peterson v. Continental Casualty Co.*, 282 F.3d 112, 118 (2d Cir. 2002) ("Absent a decision by the plan administrator, district courts have no jurisdiction to make an assessment of a beneficiary's eligibility for benefits. . . . Since the plan had yet to decide whether the plaintiff deserved benefits for the post-twenty-four-month period, the plaintiff had not suffered an actual or threatened injury.").

Furthermore, although the Court acknowledges an inherent conflict due to CIGNA's dual status as both administrator and claims payor, Straehle has failed to demonstrate the existence of any additional factors that would constitute good cause to consider evidence outside the administrative record. *See Locher v. Unum Life Ins. Co.*, 389 F.3d 288, 294-295 (2d Cir. 2004) (holding that a conflict of interest created by an administrator's dual status as claims reviewer and claims payor "does not *per se* constitute 'good cause' to consider evidence outside of the administrative record," but that such a conflict of interest, in combination with other factors such as insufficient procedures for initial or appellate review or the failure of an insurer to include a claimed reason for denying benefits in its notices to a claimant, may constitute good cause for expanding the record upon review). The Court therefore will not consider the additional testimony

---

would require Straehle to demonstrate that she was unable to perform *any* occupation. Def. Trial. Mem. at 21.

received during the evidentiary hearing in determining whether CIGNA's denial of benefits was appropriate; even if it did, it would not change the Court's conclusion.

Finally, because the Policy does not provide CIGNA with discretionary authority to determine applicants' eligibility for benefits, and the parties do not dispute that a deferential standard of review is inapplicable, the Court "reviews all aspects of [CIGNA's] determination, including fact issues, *de novo.*" *Locher*, 389 F.3d at 293 (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, the following are the Court's findings of fact and conclusions of law with respect to Straehle's claim for disability benefits.

## FINDINGS OF FACT

### A. Background and Basis for Straehle's Claim

1.  Straehle was born in 1957.  She has a Masters Degree and approximately twenty years of experience in the software industry.  In 1997 she accepted a job with NEC as a Senior Quality Assurance Engineer, which involved developing, testing, and implementing software.

2.  In October 1998, Straehle filed a claim with CIGNA for long-term disability benefits, claiming that she had become disabled after suffering an "injury" within the meaning of the Policy.  A.R. 155, 159.  Straehle's benefits application asserted that she had injured her back and shoulder at work on Friday, March 27, 1998, when she transported several boxes of books to a new office by loading them onto a chair and dragging the chair down a carpeted hallway.  Straehle completed work that day, but began to feel pain in her back and shoulder the following day.  She visited the emergency room three days later, on

Tuesday, March 31, 1998. Straehle told the emergency room doctor she had pulled a muscle in her right shoulder while moving books; following an examination, Straehle was diagnosed with a strain of the ligaments and muscles that support the spine, a "very common injury" which "often take[s] several weeks to heal." A.R. 170.

3. Straehle's former supervisor reported that Straehle's occupation required her to sit for eight hours per day, stand for one hour, and walk for one hour. The job also required occasional reaching and pushing; occasional pulling, lifting and carrying of weights up to 20 pounds, and continuous grasping and fingering. An employee of NEC's Human Resources department described Strahele's former position as "primarily sedentary," and estimated that it required sitting for 75% of the day.[6] A.R. 146.

4. In support of her application for disability benefits, Straehle submitted an extensive list of daily tasks that she claimed she was unable to perform or with which she required assistance, noting that "I need help with anything that requires gripping strength, above-waist lifting, an arched back, overhead reaching, or looking 'up'; these last three also cause me severe pain." A.R. 155. She stated that walking for a few blocks or sitting in a chair for half an hour also caused severe pain, and that she could not drive a car and avoided being a passenger in one because the attendant vibrations increased her discomfort. Straehle estimated that her job required her to sit for 75% of the day, and claimed that her pain "prevent[ed] [her] from performing [her] occupation." A.R. 153.

5. Straehle did not return to work after March 27, 1998, and was terminated on May 1, 1999.

_____

[6]This form was completed in connection with Straehle's claim for Workers' Compensation benefits.

**B. Medical Test Results**

6. X-rays of Straehle's back and shoulder did not reveal any fractures or dislocations. An April 1998 MRI of Straehle's spine and right shoulder showed (1) no abnormalities in Straehle's thoracic spine; (2) a slight bulge in the area around her lower spine[7]; (3) a disc bulge at the C5-6 vertebrae and "very minimal proliferative changes" that "minimally narrow[] the lateral recess and right neuroforamen for the right C6 nerve root"; and (4) tendonitis in the shoulder area along with a small tear to the rotator cuff. A.R. 64.

7. On September 1, 1998, Straehle underwent EMG/NCV testing. The NCV results suggested trauma or entrapment of the median nerve at the wrist and stated that this "would not explain [Straehle's] symptoms." A.R. 58. The EMG results "suggest[ed] the possibility of a C7 radiculopathy on the right," which would be "consistent" with Straehle's symptomatology; further clinical correlation was recommended. A.R. 60.

8. A second EMG conducted by the North Shore University Hospital in March 2002 found no evidence of "any nerve entrapment or cervical radiculopathy." A.R. 617. A cervical MRI conducted on the same date reported a central bulge at C4-5 and a herniation at C5-6 with no cord compression.

**C. Physicians' Reports and Diagnoses**

9. Straehle received primary care for her condition from Dr. Samuel Gladney, her general practitioner, but also consulted with numerous specialists between the time of her injury and CIGNA's decision upon appeal, including Dr. Bill Weldon, a back specialist; Dr. Ted Peters, an orthopedic surgeon; Dr. Mark Cwikla, a neurological surgeon; Dr. Ross

---

[7]Straehle has never complained of lower back pain.

Hauer, a physiatrist,[8] and Doctors Augusto Lastimosa and Mark Gordon, neurologists.

10. On April 1, 1998, one day following the emergency room diagnosis of ligament and muscle strain, Dr. Weldon found a decreased range of motion in Straehle's neck and right shoulder. He diagnosed Straehle with cervical sprain/strain and shoulder sprain/strain, and prescribed rest, an ice pack, pain medication, and physical therapy.[9]

11. As of May 8, 1999, Dr. Gladney's records reflected a diagnosis of "shoulder sprain." A.R. 521. On May 26, 1999, in connection with an application Straehle filed with the City of Arlington, Texas, for transportation assistance, Dr. Gladney stated that Straehle suffered from a "right torn rotator cuff" and "cervical and lumbar sprain" which created "limitation" in her right shoulder and pain in her neck and shoulder blades; Straehle's approximate date of recovery at this time was estimated at 3-6 months. A.R. 541.

12. Dr. Peters, who examined Straehle in May 1998, found that Straehle had two very tender trigger points on her back, and reported that although she apparently could not move her cervical spine due to upper-back pain, he found no definite positive impingement signs. Upon review of the MRI films, Dr. Peters concluded that Straehle had no clinical rotator cuff symptoms, and that the changes reflected on the MRI were related

_____

[8]Physiatrists specialize in physical medicine and rehabilitation.

[9]Dr. Weldon dismissed Straehle from his care two months later. He explained that Straehle was unhappy with a letter of medical necessity he provided for her in June 1998 in connection with an application for transportation assistance, and stated that he did "not feel [he] could provide the type of care [Straehle] is expecting." A.R. 236. In his June 1998 letter Dr. Weldon recommended that Straehle be approved for one hour of home health care per day for a period of two weeks. Dr. Weldon opined that, while Straehle suffered from severe pain in her neck, right shoulder, and mid back, her pain would stabilize within a short period, after which she would be able to engage in physical therapy.

to age and activity, rather than to the injury that Straehle has consistently asserted was the source of her claimed inability to perform her past occupation. Dr. Peters recommended trigger point injections, which Straehle refused.

13. In May 1998 Dr. Gladney referred Straehle to Dr. Cwikla for a neurological evaluation to confirm the location of Straehle's symptoms. Upon a review of the MRI results, Dr. Cwikla concluded that the changes in the cervical spine had been present for some time and that any abnormalities reflected on the MRI were "in all likelihood . . . not related to her complaints [of pain] or injuries"; Dr. Cwikla also stated that her neck pain could be related to her shoulder injury, which would not be uncommon, and recommended therapy to restrengthen her neck. A.R. 73. Dr. Cwikla opined that although Straehle claimed she could not do any exercises because of the pain in her shoulder, "[i]t is so obvious to me that she is hurting from not moving her shoulder that that is the only way she is going to be comfortable. Certainly, she is entitled to her own opinion." *Id.*

14. Dr. Cwikla's notes from the May 1998 examination indicate that he did not believe Straehle was being candid with him, specifically noting that (1) Straehle was "very focused in on every detail and was unable to give . . . a straight answer to any question"; (2) gave inconsistent answers throughout the exam regarding her ability to move her right shoulder; and (3) refused to undergo any type of physical examination because she claimed she was in too much pain, even though she rocked incessantly back and forth throughout the exam. A.R. 72. Dr. Cwikla also reported that Straehle appeared at the examination with a two-page list of daily activities which Straehle claimed her pain and physical limitations kept her from performing, and, after showing the list to Dr. Cwikla, asked if he was on "the same wavelength as her." *Id.*

15. In February 1999, Straehle flew to Chicago to see Dr. Hauser. Dr. Hauser noted during his physical examination of Straehle that she was in "obvious discomfort," had pain and a decreased range of motion in her neck and shoulder, and suffered from palpatory tenderness in the cervical area; he opined that Straehle's complaints of pain were substantiated by Dr. Gladney's medical records and the reports from the few physical therapy sessions Straehle had attended to that point. A.R. 426.

16. Upon review of the EMG and MRI results and records from Doctors Peters and Cwikla, Dr. Hauser concurred that Straehle did not suffer from cervical radiculopathy, and expressed his belief that Straehle's subjective complaints of numbness were related to injury to her cervical and thoracic ligaments. He diagnosed Straehle with a rotator cuff tear, tendonitis of the bicep, myofascial pain syndrome in the neck, cervical instability, and a thoracic spine ligament sprain. Dr. Hauser opined that the ailments all related back to the date of her injury, because "there was a definite point in time where [Straehle] started receiving medical care." He recommended Straehle for prolotherapy, which involves "a rehabilitation of incompetent structures such as ligaments and tendons by the induced proliferation of cells." A.R. 427. Dr. Hauser opined that with such therapy Straehle could regain normal function and have a productive working career, but without it she was likely to end up as a chronic pain patient with various disabilities.

17. In February 1999 Dr. Lastimosa conducted a second neurological evaluation. Dr. Lastimosa observed that Straehle had no cervical or lumbar paraspinal muscle spasms, and no point tenderness on her back. He also reported that he did not see any "definite reliable abnormality in her motor and sensory exam," and that the possibility of a C7 radiculopathy did not correlate with the MRI changes. While Dr. Lastimosa

concluded that Straehle appeared to have chronic pain syndrome, he could not rule out the possibility of "symptoms magnification." A.R. 555-57. Dr. Lastimosa also concluded that Straehle had not reached maximal medical improvement and could benefit either from chronic pain treatment or a work hardening program.

18. Dr. Gordon examined Straehle in March 2001 and reported that Straehle had no tenderness in her spine and a normal range of motion in her neck; however, the exam found local tenderness near her right scapula. Dr. Gordon diagnosed Straehle with chronic pain syndrome, noting that factors might include her "old rotator cuff injury, myofascial pain syndrome, spinal root dysfunction, and/or peripheral nerve dysfunction." A.R. 457. Given the nature of Straehle's symptoms, Dr. Gordon determined that she might be suffering from a neuropathy or radiculopathy, and recommended an additional EMG/NCV study to further assist with diagnosis and clarify the basis for her pain complaints; this testing, conducted in March 2002, returned negative results. Dr. Gordon also noted that Straehle had developed depression since her injury, and opined that the depression and pain syndrome were "probably affecting each other and contributing to the persistence of her disability." A.R. 458.[10]

19. Subsequent to Dr. Gordon's examination, Straehle notified Dr. Gordon that she had purposely provided his office with an incorrect date of birth and Social Security number.

20. On April 24, 2002, Straehle was examined by a physician at the North

---

[10]Straehle has never claimed that she was disabled or should be entitled to disability benefits because she suffers from depression or any other mental disorder, nor has she submitted evidence in support of such a claim.

Shore University Hospital, where Straehle had undergone her March 2002 EMG/NVC and MRI testing. Notes from the exam indicate that the physician found inconsistencies between the MRI results and Straehle's complaints. The physician also noted that Straehle's observed impairments were inconsistent throughout the exam, and observed that Straehle gave inconsistent effort on grip and range of motion tests.

21. In addition to reports from Straehle's treating physician and specialists, CIGNA's medical consultant and two CIGNA physicians reviewed the medical evidence. Prior to CIGNA's initial denial of benefits, the medical consultant, a registered nurse, contacted Straehle in order to ask her additional questions regarding her medical condition. By letter dated January 25, 1999, Straehle refused to answer any questions unless they were faxed to her in advance, which CIGNA declined to do.[11] The medical consultant proceeded to review the medical evidence in Straehle's file and concluded that it did not support a "functional loss." A.R. 217.

22. Straehle's file was subsequently referred to a CIGNA physician adviser, Dr. Tunaitis, who reviewed the medical evidence in the file. Dr. Tunaitis noted that Dr. Gladney's last examination of Straehle reported improving shoulder motion and concluded that Dr. Gladney's functional capacity assessment documented that Straehle was capable of performing her job with very minor accommodations.

23. On appeal in 2002, a second CIGNA physician, Dr. Patricia Loudis, reviewed all of the medical evidence in Straehle's file, including information submitted

---

[11]The administrative record also contains notes from a conversation between the case manager in charge of Straehle's claim and an employee in the Human Resources department at NEC, during which the NEC employee explained that she faxed the "ER" form directly to CIGNA because Straehle "has a tendency to falsify records." A.R. 205.

following CIGNA's initial denial, and concluded that "the objective documentation shows some decreased [range of motion] of shoulder/[cervical] spine area, however, there is no objective documentation other than claimant's reports of pain that support that she would be unable to perform a sedentary position during this time."  A.R. 985.

## C. Evidence Regarding Straehle's Functional Capacity

24.    In accordance with her specialists' and treating physician's recommendations, Straehle attended physical therapy sessions at Mid-Cities Physical Therapy and Rehabilitation from April 14 to May 7, 1998.  On October 2, 1998, Straehle visited Metroplex Sports Care ("Metroplex").  During her initial evaluation at Metroplex, she reported a burning sensation at the base of her neck and diffuse pain in the right shoulder.  Metroplex therapists concluded that she possessed "excellent rehabilitation potential," and that her long-term goal was a return to unrestricted activities without symptoms.

25.  Straehle was discharged from treatment at Metroplex on October 12, 1998, following an altercation with Metroplex staff members during which the staff members alleged that Straehle acted abusively; Strahele asserted that she lost her temper after the staff told her she would not receive the massage therapy she said she was promised.

26.  Straehle has not attempted physical therapy since her discharge from Metroplex, claiming that her pain prevents her from performing the required exercises; however, progress notes from her visits indicate that the therapy may have contributed to improvement of her symptoms.  For instance, on October 12, 1998, Straehle apparently reported to Metroplex staff members that she was feeling "much better" that day.  A.R. 85.

27.    An August 1998 examination and functional capacity evaluation

conducted by Dr. Phillip Osborne in connection with Straehle's claim for Workers' Compensation concluded that Straehle had a "very bizarre physical exam that does not make anatomical sense"; that testing in the cervical area was inconsistent with what was observed during the physical exam, and that Straehle moved more during the exam than during inclinometry measurements. A.R. 807-09. Dr. Osborne also conducted a Waddell Test,[12] which produced the following findings: (1) "non-anatomical deep tenderness over a wide area; not localized"; (2) weakness of muscle groups not explained on localized neurological bases"; and (3) "overreaction," including "disproportionate verbalization, facial expression, and pain behavior." A.R. 802. Dr. Osborne concluded that "there are psychosocial issues involved," and that Straehle's performance during the exam made it impossible to obtain a valid functional capacity assessment. A.R. 807.

28. From June 1998 through March 1999, Dr. Gladney provided Straehle with reports stating that she was unable to return to work.

29. At CIGNA's request, in November 1998 Dr. Gladney submitted a physical capacity assessment in which he opined that Straehle's prognosis for return to work was "poor"; that Straehle could sit, stand, and walk intermittently for four hours per day, that she could grasp, finger, and keyboard "continuously." A.R. 276, 278-79. Dr. Gladney did not elaborate on the basis for any of these conclusions or describe any testing which had been conducted in the course of arriving at these opinions.

30. On March 24, 1999, Dr. Gladney reported that Straehle could return to

---

[12]This test is used to help determine whether there is a behavioral component to a patient's assertions of lower back pain, and identifies individuals who need more detailed psychological assessment; three or more findings is clinically significant.

modified duty on May 3, 1999, with the following restrictions: "no pushing or pulling over 10 lbs.," "no prolonged standing or walking for 4 hours a day," "no reaching or lifting above shoulder," and "no lifting or carrying over 10 lbs." A.R. 523. No restrictions involving Straehle's ability to sit were noted.

31. On May 18, 1999, Dr. Gladney submitted two letters to CIGNA which explained that the physical ability assessment form he had completed in November 1998 had not requested the details of his evaluation, and that he wanted to "ensure that [his] full, detailed evaluation is on the record with CIGNA."[13] A.R. 507. In the letter Dr. Gladney opined that impairments from Straehle's injury "prevent her from being able to perform the tasks required in her job; that is, she is disabled"; Dr. Gladney also stated that Strahele has been "disabled during the entire time that I have been treating her for this injury." A.R. 508. The letter further reports that Straehle is limited to four hours of work activities per day which involve sitting, standing, or walking, and that Straehle should have frequent 20 to 60 minute breaks from such activities. Although Dr. Gladney had previously reported that Straehle could continuously grasp and finger, the May 1999 letter states without any explanation that Straehle can only grasp and finger for 10 - 25% of the day.

32. A second functional capacity assessment conducted in February 1999 by Parks Physical Therapy stated that Straehle had an observed sitting capacity of 20 minutes, but, after comprehensive testing, concluded that Straehle was "functioning in the sedentary work level." A.R. 553. The evaluator also noted that the results of a grip-strength test designed to measure maximum voluntary effort indicated that Straehle was giving

---

[13]The two letters are identical in substance but each is inexplicably formatted in a different type and style.

"inconsistent maximal effort"; that she exhibited "moderate pain behaviors"; and that she "appear[ed] to be self-limiting secondary to pain" with most evaluation tasks. A.R. 550-553.

33. On September 12, 2001, the Social Security Administration denied Straehle's application for supplemental security income benefits, stating:

> The medical evidence shows that you have had pain and stiffness with some restriction of your activities and ability to care for your needs. We realize that at present you are unable to perform certain kinds of work. But based on your age of 43 years, education of 16 years, and your experience, you can perform light work (for example, you could life a maximum of 20 lbs., with frequent lifting or carrying of objects weighing up to 10 lbs., or walk or stand for much of the working day) and a job which would involve less stress than your past work.

A.R. 951.

## CONCLUSIONS OF LAW

In order to demonstrate eligibility for the first 24 months of benefits under her employer's long-term disability policy, Straehle has the burden of showing that she was disabled by reason of her inability to perform all the material duties of her regular occupation. The Court concludes that taken as a whole, the objective and subjective evidence offered by Straehle does not support a conclusion that she was disabled within the meaning of the Policy at the time CIGNA made its final determination denying disability benefits.

### A. Objective Evidence

#### 1. Medical Testing and Diagnoses

Neither Straehle's treating physician nor her specialists presented any

medical evidence that would explain either the extent of her pain complaints and claimed limitations or her asserted inability to perform her sedentary occupation. The physicians who examined Straehle immediately after her injury, including her treating physician, Dr. Gladney, did not diagnose Straehle with anything more serious than back and shoulder sprain or strain, tendonitis, and a rotator cuff tear, injuries which certainly may prevent her from performing some activities, but which do not necessarily mean that she was incapable of sitting and typing at a computer for six hours per day. Two neurologists, Doctors Gordon and Lastimosa, failed even to find any tenderness in her back during their physical examinations. Furthermore, the orthopedic surgeon and neurologist who examined Straehle shortly after her accident concluded that the changes in her cervical spine that were reflected in her MRI results had been present for some time and were not related to the pain she complained of or to the event which formed the basis for her benefits claim. These objective medical results, therefore, do not substantiate or document the existence of a disability or pain caused by the event which Straehle asserts injured her so badly that she was rendered unable to work. Although some later diagnoses concluded that Straehle was suffering from chronic pain syndrome related to back and shoulder injury, they did not explain why the ailments would cause her pain severe enough to prevent her from sitting for 75% of her workday or performing the other duties of her sedentary occupation. An early EMG suggested the possibility of a radiculopathy, but this was ruled out both by subsequent testing and by MRI results that, as observed by Dr. Lastimosa, were inconsistent with radiculopathy.

Both Straehle's treating physician and her specialists recommended conservative treatments including rest, pain medication, and physical therapy; the

administrative record does not reflect that any surgical procedures were ever discussed or counseled against for any reason. Although the physical therapy center that Straehle visited soon after her injury concluded that she was an excellent candidate for rehabilitation, and although Straehle herself appeared to experience some improvement as a result of the therapy, she did not continue the therapy following an altercation with staff members in October 1998, suggesting that any limitations she presently suffers may be attributable to her failure to complete the treatment recommended by her physicians following her injury. Moreover, at least two physicians, Dr. Osborne and Dr. Gordon, suggested that emotional or psychosocial issues were at least in part to blame for her claimed limitations.

## 2. Functional Capacity Assessments

The two functional capacity assessments also do not support a conclusion that Straehle was unable to perform the requirements of her job. The first, by Parks Physical Therapy, concluded that Straehle was performing at the sedentary work level, and noted that testing during the evaluation indicated that Straehle was giving inconsistent voluntary effort. The second, conducted by Dr. Osborne in connection with Straehle's claim for Workers' Compensation benefits, produced incongruous results which may have been attributable to the fact that Straehle's effort during testing was observed to be inconsistent. During this evaluation, Dr. Osborne also noted that Straehle's physical exam did not make anatomical sense, and that Straehle was observed to be overreacting during the exam; these inconsistencies rendered it impossible for Dr. Osborne to provide a valid capacity assessment.

## 3. Opinion of Straehle's Treating Physican

Apart from Straehle's subjective complaints of pain, the only evidence to support her claim that she was unable to perform her past occupation is Dr. Gladney's physical capacity assessment, which, unlike the functional capacity assessments discussed above, does not appear to be supported by any functional testing or other objective evaluations. When a district court reviews an ERISA administrator's decision under a *de novo* standard, the treating physician rule, which in the context of Social Security disability claims requires the fact-finder to give greater deference to the judgment of a patient's treating physician, is inapplicable. *See Connors v. Connecticut General Life Ins. Co.*, 272 F.3d 127, 136 n.4 (2d Cir. 2001). A district court is instead "free to evaluate [a treating physician's] opinion in the context of any factors it consider[s] relevant, such as the length and nature of their relationship, the level of the doctor's expertise, and the compatibility of the opinion with the other evidence." *Id*. at 136.

The Court discounts Dr. Gladney's conclusions regarding Straehle's abilities; he does not explain why any of her documented ailments support a finding that she is unable to sit and type at a computer or perform any of the other duties of her sedentary occupation, but merely makes conclusory statements that her ability to do these tasks has been compromised. It appears that Dr. Gladney reached his conclusions regarding Straehle's limitations based solely on his "acceptance of plaintiff's subjective complaints" – "an acceptance more or less required of treating physicians," but by no means required of the Court. *Maniatty v. UnumProvident Corp.*, 218 F.Supp.2d 500, 504 (S.D.N.Y. 2002). Additionally, the Court is troubled by the fact that Dr. Gladney's opinions regarding her physical capabilities were at least in part contradictory and changed significantly over time with no apparent explanation. These unexplained discrepancies suggest that Dr. Gladney's

opinion is not entitled to great weight. Finally, Dr. Gladney's assertion that Straehle is unable to perform her past work is inconsistent with the diagnoses of the many specialists Straehle consulted, all of whom failed to uncover any condition that would explain the extent of her claimed pain and limitations.

## B. Subjective Evidence

The Court also concludes that Straehle's subjective complaints of pain do not support a finding that she is unable to perform her past work. "It has long been the law of this Circuit that 'the subjective element of pain is an important factor to be considered in determining disability,'" and a court "cannot dismiss the complaints of pain as legally insufficient evidence of disability." *Connors*, 272 F.3d at 136 (citations omitted). However, "a district court reviewing an administrator's decision *de novo* is not required to accept such complaints as credible." *Id.* (citing *Aponte v. Sec'y of the Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)).

The Court finds that Straehle is not a credible source of evidence regarding the extent of her pain and impairments. As discussed above, the severity of these complaints is inconsistent with the bulk of the objective medical evidence in the administrative record. Furthermore, a number of Straehle's own physicians suggested that Straehle might be exaggerating her symptoms or her physical limitations, or that emotional issues might be compounding her asserted impairments. In particular, Dr. Cwikla's examination notes indicate that he did not believe Straehle was being honest with him because she gave inconsistent answers regarding her limitations, and appeared focused on securing his agreement with her asserted impairments. Examinations by Dr. Osborne, an unnamed physician at North Shore University Hospital, and a therapist at Parks Physical

Therapy revealed that Straehle gave inconsistent effort on tests designed to measure her impairments, that her physical examination did not make sense, that testing did not correlate with observations made during the exam, and that Straehle appeared to be overreacting.  Dr. Lastimosa also found after examining Straehle that he could not rule out symptom magnification.

Finally, although the Court does not rely solely on the following factors for its determination regarding Straehle's credibility, the Court is troubled that an NEC Human Resources employee found it necessary to fax information regarding Straehle's disability claim to CIGNA because of an alleged tendency by Straehle to falsify records, as well as by the fact that Straehle purposely provided Dr. Gordon with an incorrect birthdate and false Social Security number.  Straehle's refusal to answer CIGNA's questions about her condition and limitations without the opportunity to review them in advance also suggests that Straehle may have been concerned with preparing answers that would support her asserted disability rather than with providing honest information.

Because the Court finds that (1) Straehle's subjective complaints of pain and impairments do not correlate with the objective medical evidence in the administrative record, and she is not otherwise a credible source of information about the extent of her pain and limitations; (2) the bulk of the medical evidence in the record indicates that Straehle suffers from relatively common and minor injuries that her specialists concluded should respond well to conservative treatment, and (3) the only objective evidence in the record to support Straehle's assertion that she cannot perform her past occupation is Dr. Gladney's unsupported, conclusory, and contradictory opinion regarding her asserted disabilities and limitations, the Court concludes that Straehle has not met her burden of

demonstrating that she is disabled under the terms of the Policy.

As previously noted, even if the Court were to consider the additional testimony received during the evidentiary hearing, it would not affect the Court's decision. Straehle's testimony regarding her symptoms and limitations was merely cumulative of evidence already in the record; her subjective complaints of pain and asserted impairments are well-documented, not only in her benefits application, but also in her physicians' records. The Court also discounts Dr. Zuckerman's testimony regarding Straehle's inability to work. Dr. Zuckerman is an internist with no special expertise in back, spinal, or shoulder injuries; furthermore, he admits that his conclusions are based upon an incomplete review of the medical evidence and opinions in the file. Dr. Zuckerman relied solely on the reports of Doctors Hauser and Gordon, and did not review the underlying EMG or MRI results, or the reports from Doctors Cwikla and Peters, who found no medical explanation for Straehle's asserted pain and disabilities, and who opined that any changes in Straehle's cervical spine were not injury-related.

Moreover, while Dr. Zuckerman stated in a conclusory fashion that Straehle was in "severe pain" that prevented her from performing her past occupation because "she couldn't sit for the whole day, move around as might be required," his opinion regarding her inability to perform her job is unconvincing, not only because it does not appear to be based on any objective testing or evaluations, but also because Dr. Zuckerman admitted that, apart from the fact that Straehle's position required her to "work at a desk with computers," he was not familiar with the requirements of her past occupation and "do[es] not] know exactly what [she] did," Tr. at 28-29.

**CONCLUSION**

The Court concludes that Straehle has not demonstrated that she was unable to perform the duties of her regular occupation; therefore, she is not entitled to the first 24 months of disability benefits under the Policy. CIGNA's denial of benefits is affirmed and the complaint is dismissed.

**SO ORDERED.**

_____
FREDERIC BLOCK
United States District Judge

Brooklyn, New York
September 30, 2005